Filed 2/14/14  P. v. Suazo CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060885 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD 216401) |
| IAN ALEX SUAZO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Einhorn, Judge. Affirmed.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Julie L. Garland, Assistant Attorneys General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ian Alex Suazo of the second degree murder of Ocie Raines (Pen. Code,[1] § 187, subd. (a)), and found true an allegation that Suazo used a knife during the murder. (§ 1192.7, subd. (c)(23).) The jury found that Suazo was sane at the time he committed the offense. The court sentenced Suazo to an indeterminate term of 15 years to life. The court denied Suazo's new trial motion brought on grounds that the court had erroneously instructed the jury regarding the presumption of sanity in the guilt phase of the trial, and insufficient evidence supported the jury's finding of sanity.

Suazo contends: (1) He was denied a fair trial before an impartial jury because the jury selection process was flawed; (2) the court erroneously instructed the jury regarding the presumption of sanity during the guilt phase; (3) the court erroneously instructed the jury regarding flight; (4) the jury could not reasonably reject the substantial evidence of his insanity; (5) the court incorrectly instructed the jury regarding the effect of intoxication on the defense of insanity; (6) the court violated his right to a fair trial by rejecting his requested jury instruction specifying that he acted on the advice of counsel in refusing to meet with the prosecution's psychiatrist; and (7) there was cumulative error. We affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case—Guilt Phase*

In September 2008, Suazo, his cousin Paul Suazo,[2] and Raines lived together in a Pacific Beach apartment. Suazo and Raines had a good relationship. They both worked at Sinbad's Cafe, a hookah bar. Suazo worked as an attendant and Raines as a bouncer. Suazo drank alcohol every day. On September 17, 2008, Suazo was fired for being drunk on the job. He became angry, scared, and concerned about how he would pay his rent and other bills.

On September 21, 2008, Suazo stole and swallowed approximately 20 of Raines's Xanax pills in an apparent suicide attempt.

Near midnight on September 23, 2008, Paul invited two female friends from his work to a party at the apartment. Raines joined them to watch a movie. Suazo and others at the party drank alcohol and smoked marijuana. Suazo was sad and angry. He did not watch the movie but instead paced around. At one point, Paul was scared because he thought Suazo "looked like a demon." Suazo flirted with the females, but they were not interested in him. Before the movie ended, Suazo told the females they were getting loud and asked them to leave, which they did.

On September 24, 2008, at approximately 2:30 a.m., Raines contacted one of the females by telephone and text message.

---

2     To avoid confusion, we refer to all of Suazo's family members by their first names.

At approximately 2:30 a.m., Suazo's neighbor, Blair Robb, heard Raines return home and speak on his cell phone. A few minutes afterwards, an altercation began in Suazo's apartment. Robb testified at trial, "It sounded like somebody being thrown into a wall. And then I heard somebody saying, 'what the fuck is your problem, man? What the fuck is your problem?' " Afterwards, Raines, whose voice was muffled as if he was pinned down, said something like, "Help. Help. Ian, Ian, you are killing me. Ian, you are killing me. I don't want to die." The altercation lasted approximately 10 minutes. It sounded to Robb like someone left Suazo's apartment approximately 20 minutes later.

Around 4:00 a.m., Paul returned to Suazo's apartment and found Raines dead on the living room floor. Water was running in the bathtub and it was almost overflowing.

*Forensic Evidence*

Detectives investigating the crime scene found a knife handle underneath Raines's body. The serrated portion of the knife was bent and found in the bathtub.

Crime scene reconstruction expert Brian Kennedy reviewed the crime scene photos and sketches, autopsy reports and statements by emergency responders. He concluded based on the bloodstain patterns and Raines's lack of many defensive wounds that Suazo and Raines did not engage in much mutual combat. Kennedy opined Suazo likely either pulled Raines's shirt over his head or waited until Raines was getting undressed and surprised him. Raines possibly was kneeling during any combat.

*Autopsy*

The forensic pathologist who performed the autopsy testified Raines had abrasions on his knees and the top of his left foot, indicating he was kneeling on a carpet floor

4

shortly before his death. Raines was cut across the neck and throat with a serrated knife. He died of multiple sharp force injuries to his face and neck and primarily bled to death, but he probably had difficulty breathing because of his cut epiglottis. Raines's carotid arteries also might have been compressed. The pathologist testified that given Raines's failure to escape the attack, and the placement of his injuries, he most likely was attacked from behind, making it easier for his assailant to expend the fair amount of effort necessary to cause Raines's death, which was not quick. Further, Raines likely was conscious for a significant time during the attack. Suazo's blood sample was taken at approximately 9:43 a.m. on September 24, 2008, and he tested positive for alcohol and cocaine.

*Suazo's Apprehension*

On September 24, 2008, at approximately 9:00 a.m., police received reports that Suazo was running in and out of traffic. Police found Suazo lying in the street. His breath had a strong odor of alcohol. His hands were bloody, and one hand seemed almost sawed off. Suazo was in and out of consciousness, and did not recall what had happened. He identified himself to police using a different surname.

*Suazo's Interview with Detectives*

At approximately 11:00 a.m. on the day police apprehended Suazo, San Diego Police Department Detective Ron Newquist and another detective interviewed Suazo at the hospital following his surgery, and approximately 15 minutes after Suazo had received pain medication. Detectives questioned Suazo to verify he was alert, and he correctly identified the current United States President and the two nominees in the

5

upcoming presidential elections. Detectives administered warnings to Suazo as required by *Miranda v. Arizona* (1966) 384 U.S. 436. When detectives informed Suazo he was under arrest, Suazo asked whether it related to his suicide attempt. Suazo said he did not much remember the events relating to Raines's death. He mentioned he had consumed approximately 15 Xanax pills a couple of days earlier. Suazo said that in the past few months he had blacked out five or six times because he had drunk alcohol. Suazo said that for three days he had been hearing voices tell him to hurt himself, but they did not tell him to hurt Raines or Paul. Suazo said, "I was trying to be good and the voices were going away." The voices he heard at the hospital were mean and repeatedly called him "a bitch and a faggot."

During the interview, Suazo remembered returning home before the incident and taking a line of cocaine that Raines gave him. When detectives asked if Suazo had taken other drugs that night, he admitted drinking alcohol, and also stated, "I smoked some weed, I don't know." Suazo remembered that Raines was in the living room during the incident. Suazo said he had blacked out, adding, "I woke up in the tub and I was carving my wrists." Suazo did not remember cutting Raines, stating, "I don't know why I hurt [Raines]" and, "I don't have any reason to hurt [Raines]. I don't know why I did that." When asked if he had hurt Raines, Suazo acknowledged, "I must have. I was the only one there when I woke up." Suazo had memory "flashes" of himself stabbing in a downward motion, but not of any fight with Raines. Suazo said that when he awoke, he saw Raines dead on the bathroom floor, with blood near Raines's stomach. Suazo ran to the beach and slept. Detectives asked Suazo if he was sure he had blacked out or if he

6

just did not want to remember what had happened. Suazo cried and replied, "I don't want to remember." Police asked Suazo if he thought anybody else was involved in Raines's death, and Suazo replied, "No." Suazo did not at first remember getting hit by a vehicle.

*Defense Case—Guilt Phase*

*Suazo's Early Drug Use and Mental Health Problems*

Suazo's father Nathan testified Suazo started drinking alcohol and smoking marijuana at age 16. In March 2005, Nathan tried to get Suazo help for his drug and alcohol abuse, but Suazo threatened to run away. Later in 2005, Suazo was 18 years old and hearing voices. He was placed on a hospital hold for 72 hours for attempted suicide. At that time Suazo's blood tested positive for PCP and marijuana. Afterwards, Suazo was hospitalized for approximately three weeks. A few weeks after Suazo's hospitalization, he complained of hearing guns going off in his head, someone singing rap music to him, and crows chasing him. Nathan took Suazo to Psychiatric Centers of San Diego, but they did not admit him because they did not consider him a harm to himself. A few weeks later, Suazo was arrested for stealing a purse and possession of methamphetamine. He was placed on probation for 18 months, prohibited from using drugs or alcohol, and subjected to random drug tests. Ever since Suazo's 2005 hospitalization, Nathan was concerned Suazo would become paranoid and delusional again. Nathan did not know the source of Suazo's problem, but realized drugs and alcohol "agitated" it. A doctor had specifically warned Suazo in 2005 that he could no longer use any type of drug, or he risked having another psychotic episode.

7

Suazo's mother Julie testified that while Suazo was on probation he spoke to her several times about his belief that the movie "The Matrix" was probably true; all humans are dreaming, and we are not really here on earth. Suazo believed his dreams were significant, and that during them he could travel into peoples' minds and they could enter his mind. Suazo believed freemasons were powerful, secretive, and probably up to bad things in the world. Suazo also was very worried about crows and other black birds. He said several times that crows and certain bugs, like mosquito hawks and palmetto bugs, had evil spirits. Suazo insisted Julie research whether some black birds that appeared in a television commercial were crows. Suazo also would tell Julie that things he heard on television were said just to him. Suazo obsessively read the Bible's Book of Revelations and searched for references to 666 and the anti-Christ. Suazo several times referred to himself as the Lamb of God. Suazo started working at Sinbad's in September 2007 and he was certain he could hear people talking about him through the air vents. He believed voices talked to him through fans and from white noise on television sets.

Julie testified that in early 2008, Suazo returned to live with her temporarily, and still drank alcohol in violation of his probation conditions and her house rules. He continued working full time at Sinbad's and saved money to afford the rent on his Pacific Beach apartment.

In approximately June 2008, Courtney Fond-Leoncini met Suazo when she stayed at Suazo's apartment with Paul. Whenever she and Paul became affectionate with each other, Suazo would get angry and yell, "Fuck you," to no one in particular. Suazo drank beers every morning. At first Suazo appeared happy, but after he was fired he drank and

8

smoked marijuana more, did not eat much food, and was disheveled. Suazo became increasingly negative and said his friends hated him and his life was worthless. He also repeatedly referred to his ex-fiancée.

*Events before the Murder*

On September 16, 2008, Suazo asked Nathan for advice about his "mid-life crisis," stating he would be dead by age 40. Shocked by this conversation, Nathan told Suazo he was too young for such a crisis, and he would not die so soon. Nathan asked Suazo if he was using marijuana, which Suazo confirmed. Suazo also said he was using Vicodin that Raines had sold him. Nathan cautioned Suazo, "You know you're not supposed to be taking these types of drugs because your mind can't handle it." Suazo replied, "It's under control." The next evening, Nathan was visiting Suazo when Suazo's employer phoned and said he likely would fire Suazo for drinking on the job. Suazo was angry. Nathan offered Suazo a better paying job, and eventually persuaded him to spend the night at Nathan's home. Nathan was surprised when Suazo said he loved Nathan and asked him for a goodnight hug.

To Nathan, it seemed Suazo became obsessed with his job loss, causing Suazo "a ping-pong ball of emotions from one second to the next." Suazo acted paranoid once when Nathan's watch alarm was activated. On September 19, 2008, Suazo was manic and agitated when working with Nathan and requested Xanax, saying he was hearing voices. Nathan reluctantly gave Suazo a Xanax pill, but refused Suazo's request for a second pill. Nathan instead offered Suazo a beer. But Suazo explained that alcohol no longer quieted the voices. Suazo explained that he was fired because when things got

9

quiet at his work, he started hearing voices; therefore, he went to a next door bar and drank alcohol. Suazo claimed Raines or other persons had betrayed him by telling his employer about his drinking.

On September 20, 2008, Nathan again took Suazo to work with him, but Suazo was unproductive and complained about hearing voices. Nathan did not take Suazo to work the next day, fearing Suazo would again be unproductive.

On September 21, 2008, Suazo consumed approximately 20 Xanax pills in addition to beers, Vicodin and Robitussin. He could barely stand up. Fond-Leoncini thought he was going to die. She suggested that they take Suazo to the hospital, but Paul refused, noting that drugs and drug paraphernalia were inside their apartment.

On September 22, 2008, Suazo said he was hearing a screaming voice in his head, and insisted that Nathan take him to the doctor. Nathan canceled all his work plans and picked up Suazo, who told him he had taken five Xanax pills with alcohol. Nathan took Suazo to the Psychiatric Center in Chula Vista, expecting they would prescribe Seroquel to stop the screaming voices in Suazo's head. But the doctor instead referred Suazo to a detoxification center. Nathan and Suazo were angry and Nathan proposed taking Suazo to either the emergency room or San Diego County Mental Health Services, but Suazo refused, saying that at those places they "put stuff in the orange juice." That night, Nathan took Suazo to Julie's house, where Suazo did another "bizarre act" by sitting in Julie's lap. He also hugged and kissed her. Julie testified that Suazo had felt better while at her house.

10

*The Hours before the Murder*

On the morning of September 23, 2008, Julie dropped off Suazo at the bus stop. He was sad and quiet. She was concerned he might miss the bus, so she drove around the block. But she did not see him after the bus had left, and assumed he had caught it. She telephoned him around noon and he said he had slept and was feeling much better. In another phone call that day, Suazo asked Julie whether salt "would keep out the soul collector."[3] She jokingly told him, "I [don't] know what it would do for the soul collector, but it might keep the ants out." He seemed to laugh at the comment. Around 6:00 p.m., she took him food and he seemed calm. He pointed out he had placed salt on his apartment window frames, and they laughed at that. Julie tried to convince Suazo to spend the night at her house, but he refused, saying she would have to seal all her windows and doors with salt.

Nathan telephoned Suazo to check on him and Suazo said everything was okay because he "was searching the Internet for ways to keep the soul collector from getting him," and Suazo was required to put salt on the window frames and around doorjambs to keep the soul collector out of the house. Nathan admonished him to stop researching on the Internet about that topic.

Fond-Leoncini saw Suazo put salt on the window frames and around the carpet in his apartment. He told her not to ask what he was doing, and so she did not. He later told her he was protecting himself from evil spirits, and folded his arms across his chest and

---

3    The parties stipulated that police found a web page titled "Protection Against Soul Collection" on Suazo's laptop.

11

rocked back and forth. He said he had obtained the information from the Internet. Suazo told Fond-Leoncini that he could hear people's thoughts.

In the night, Raines had asked the housemates to leave the apartment because he was bringing a female over, so Fond-Leoncini took Suazo for a drive, during which Suazo said he had feelings for her. She told him she was not interested. Around 10:30 p.m., while they were driving around, he asked her to stop at a church, saying he wanted to go in by himself. Approximately 15 minutes later, he came for her, saying he needed company inside the church. She sat with him in the church. He cried and said his life was worthless. She told him his life was worth something. She dropped him off at his apartment around 11:00 p.m.

Nathan telephoned Suazo around 11:30 p.m., and Suazo sounded happy, told Nathan he loved him and said, "I'm all right, Dad. Everything's under control."

*Defense Case—Sanity Phase*

Psychiatrist Zvjezdan Nuhic testified that on September 22, 2008, he met with Suazo and Nathan at the Psychiatric Center. Suazo complained that auditory hallucinations had commanded him to hurt himself, and the Bible told him to kill witches. Dr. Nuhic diagnosed Suazo with alcohol dependence, marijuana abuse and nonspecified psychosis. The psychiatrist recommended Suazo go to a drug detoxification facility.

On September 24, 2008, San Diego Department Police Officer Omar Sinclair rode with Suazo in an ambulance to the hospital. Suazo provided his name and birth date, but did not remember what had happened that day. Suazo told Sinclair, "I want to see your

12

eyes. I can't see you." Sinclair could not understand other things Suazo said, except "Zanzibar," which is the name of another hookah bar.

Court appointed psychologist Katherine Di Francesca evaluated Suazo to determine his sanity. She interviewed him in February and March 2009. He told her witchcraft was real, his belief in it came from studying it since he was 17 years old, and it had a hold on him. Suazo spoke about crows torturing him, the third eye, freemasons and matrixes. Suazo ascribed powers to someone named "Q," and said he could not say no to Q.[4] Dr. Di Francesca concluded that Suazo suffered from schizophrenia, paranoid type, and possibly schizoaffective disorder, depressive type. She opined that when he killed Raines, Suazo could not understand the nature and quality of his actions or understand the difference between right and wrong. She testified that if Suazo's "mental state was caused by intoxication and not by a settled mental illness, then he does not qualify for an insanity defense at all." Dr. Di Francesca concluded that in the moments leading to Raines's death, Suazo was "very confused. He was agitated. He was symptomatic in that he was hearing voices and in a severe delusional state." Dr. Di Francesca stated Suazo's "heightened emotionality" was manifested by the wounds he inflicted on Raines, and his

---

[4]     Quinton Franklin, also known as "Q," testified for the prosecution in the sanity phase. He stated he knew Raines and Suazo because he frequented Sinbad's. Franklin testified he and Suazo shared an interest in rap music. Suazo was upset and angry about his firing, and would say things like, "They think it's funny. But if I, like, blow up the building, then they would take me seriously." Franklin denied ever telling Suazo that Raines was a racist, or that Raines had to die.

13

attempts to kill himself. She also noted Suazo aggravated his mental condition by using alcohol and drugs.

Psychiatrist Jaga Glassman interviewed Suazo four times, beginning in October 2008. He opined Suazo was "very psychotic and the data fit best for a diagnosis of schizophrenia." Dr. Glassman concluded Suazo was not legally sane when he killed Raines. Dr. Glassman stated that in an October 2008 interview, Suazo did not remember killing Raines and was unable to provide a coherent account of the murder. Instead, Suazo "was immediately talking about soul catchers and demons and talking to crows and having crows talk back to him and voices he was hearing through the fan, and on, and on, and on about more delusional beliefs."

Dr. Glassman testified Suazo gave delusional responses regarding why he killed Raines, and Suazo claimed to act under orders from Q. Dr. Glassman stated: "[I]t was clear that [Suazo] was terrified that the soul collector was coming after him or that his soul was going to be collected and that Q, or this deity or God or supernatural force named Q was part of it. [¶] At times [Suazo] seemed to believe that [Raines] was being controlled by Q and had been sent to collect [Suazo's] soul. At other times he seemed to believe that he himself was being controlled by Q and was the soul collector. [¶] Suazo also talked about delusional beliefs involving race. He believed that although his skin is not African-American that in some way he is really African-American in his soul. And because [Raines] had used the 'N' word . . . that he was being directed to have to take [Raines] out for that reason and that the supernatural forces or God were telling him that that was something that he had to do."

14

Dr. Glassman opined, "Since [Suazo] was fired from his job four or five days before that, his psychotic symptoms were building. He was filled with these delusions we've talked about, about soul collectors, hearing voices, hearing this God or idol talking to him. [¶] He was becoming terrified because he believed that some force was taking him over, was going to collect his soul. He was desperately spending time on the internet trying to find out how to ward off soul collection and demon possession, and things like that. [¶] Desperately trying to find some way to save himself from something that was worse than death; losing his soul."

Psychologist Clark Clipson, Ph.D., interviewed Suazo in April and May 2009, and testified that on September 24, 2008, Suazo was suffering from schizophrenia. Suazo told Dr. Clipson that Q had told him to kill Raines, and "Q was like God. He was the only voice I heard in church." Suazo said Q had told him to jump in front of a car. When Suazo woke up in the hospital, he thought he was dead and they were harvesting his soul. Dr. Clipson concluded that when Suazo killed Raines, Suazo was acutely psychotic; intoxicated and legally insane. Suazo's alcohol and drug use worsened his underlying mental illness.

*Prosecution Case—Sanity Phase*

The manager and Owner of Sinbad's testified that on September 23, 2008, between 9:00 p.m. and 10:00 p.m., Suazo went to Sinbad's to pick up Raines's pay; but the manager refused to give it to Suazo, and instead gave Suazo his own wages owed following his termination.

15

On September 27 and September 28, 2008, Psychiatrist Charles Ettari evaluated Suazo, who was oriented as to time and place; his thinking was logical, and his memory intact, except for a period of amnesia surrounding events of the previous days. Suazo did not have any psychosis or suicidal ideation. Dr. Ettari diagnosed Suazo with polysubstance abuse, but noted Suazo was experiencing anxiety and depression because of the murder charges against him. Suazo reported that for approximately the past year and a half he had had auditory hallucinations telling him demeaning things. The voices also commanded him to reapply for his job. Nevertheless, Dr. Ettari ruled out a schizophrenia diagnosis for Suazo.

In a jailhouse telephone call on October 7, 2008, Suazo told his friend, Corrine Senske, that Dr. Glassman had arrived for his first interview earlier that day, and Suazo had checked Dr. Glassman's identification card before the meeting, prompting Dr. Glassman to ask if Suazo was paranoid. Suazo told Senske he was worried about the impression he had made on Dr. Glassman. Suazo felt Dr. Glassman was trying to see if Suazo was faking his symptoms, and that annoyed Suazo.

In a jailhouse telephone call on October 20, 2009, Suazo defied Julie's instruction that he not speak on the telephone regarding his desire to file a lawsuit against the psychiatrist at Psychiatric Centers for failing to prescribe him any drug to help him in September 2008. Julie reminded Suazo the call was being monitored, but Suazo replied that his defense involved his mental health; therefore, he could speak about that topic. Julie told Suazo to consult with his counsel, and Suazo said he had done so and his attorney had said, "If you're feeling anything is wrong, don't hesitate to, to screw yourself

16

on medical. But [defense counsel] said that . . . they can use whatever they feel they can against you." Suazo continued to say that he had talked to the psychiatrist in jail, asking if their conversations were confidential. The psychiatrist replied that the judge can look at it if he wants. Suazo's reaction to that reply was, "Like fuck you buddy." Suazo also told Julie, "I'm almost thinking about like people I should, old people I should try to call up to try to add, just be witnesses for me. Shit, they could be good witnesses. I've told them so much shit." Julie asked who he was referring to, and Suazo replied, "Ryan and all them. Got them actually to believe a lot of my shit that I believe. They might, that might be even a reason that they wouldn't go cause they, they'd all think it's wrong."

Court-appointed psychiatrist Matthew Carroll interviewed Suazo on February 6, 2009, and diagnosed him with polysubstance dependence and psychotic disorder not otherwise specified. Dr. Carroll opined Raines's death was "a direct result of alcohol and drug usage," and if Suazo had not used them in the hours before the incident, it is highly unlikely he would have killed Raines. Dr. Carroll concluded Suazo did not meet the test for insanity. Dr. Carroll testified that in reaching that determination, "We have to go through the actions and see did [Suazo] understand that what he was doing could likely result in the death of another person. . . . So the first step, he got a knife. He had to get the knife from somewhere. He didn't pick up a [television] remote or something and start hitting [Raines] with it. He doesn't pick up a book and just start hitting [Raines] in the knee with it. No. He gets a knife and goes to [Raines]. We don't know exactly what happened, but the reconstruction suggests that he effectively ambushes [Raines] from behind in some way."

17

Dr. Carroll opined Raines's death was not accidental: "This is much more purposeful. We're looking at the nature of quality [*sic*] in an act. . . . Is [Suazo] sitting there screaming, 'There's demons around me,' swinging the knife around and his roommate happens to get hit? No. It looks like he specifically went after [Raines] for the purposes of harming [him] severely. You look at what did he do with the knife. We know based on the autopsy report and the crime scene that he cut [Raines] in the neck several times." Dr. Carroll added, "We have another witness saying he hears [Raines] saying, 'You're killing me. You're killing me.' There's nothing to suggest that, in my opinion, [Suazo's] mental illness was so severe he wouldn't have understood those words. . . . It's not like he lost his ability to understand the English language." Dr. Carroll also analyzed Suazo's interview with detectives and noted, "At no time does [Suazo] make any statements such as, 'I got rid of the soul catcher,' or 'I got rid of the demon' or something of that sort to suggest that [Suazo] doesn't think [Raines] is a human being."

Dr. Carroll also addressed Suazo's statement to Dr. Glassman that Raines had to be killed because Raines was racist. Dr. Carroll stated: "There are many, many racist people in this country. We don't have a right to just go kill them because they're racist. It's still legally wrong. It's still morally wrong. And the fact that [Suazo] talks about how he had to kill [Raines] suggests he fully understood the nature and quality. Maybe he said he doesn't remember what happened, but he understood [he] was killing a human being. [He] was killing [Raines]." Dr. Carroll believed Suazo's views on this issue did not show he was insane, because Suazo knew the nature and quality of his acts, and that his conduct was wrong.

18

Dr. Carroll referred to Suazo's accounts of the events that occurred the night of the murder as "a changing, evolving story that has changed from the day of the crime through all the doctors. So [Suazo's] gone to the point now where he's saying that he has to do this for God, which is giving more of a reason to do that. It's somewhat interesting. I don't know the answer, but it certainly appears it's somewhat self-serving, as each time he changed the story with the doctor[s] to make it worse and worse."

In analyzing Suazo's post-murder conduct, Dr. Carroll noted Suazo had attempted suicide: "You have someone who is feeling guilty about what they've done that they tried to kill themselves. They want to die because of what they've done. Now, he may have other reasons too. He talks about hearing voices telling him to kill himself. I'm not saying that's not possible, but those factors when you look at them are highly suggestive of somebody who is feeling guilty about the situation. [¶] [Suazo] wakes up from the beach. He is not dead. He then runs in front of a car at this point. Again, he doesn't exactly remember it. Highly suggestive of somebody who is again trying to kill himself. . . . [¶] Now the police come at this point. Police ask him his name. He gives a false last name," suggesting that Suazo understood that his conduct was wrong.

Dr. Carroll noted Suazo did not appear to have symptoms of psychosis during his interview with Dr. Ettari. In fact, Suazo did not receive medication until a month after his interviews with Dr. Ettari. These facts prompted Dr. Carroll to state: "Well, if you have someone that is this mentally ill during their crime that they can't understand the nature and quality of their acts and can't understand the difference between right and

19

wrong, why are they all of a sudden better? And we have a whole month they're not even needing any mental health treatment during this period."

Dr. Carroll further noted Suazo did not sound psychotic or delusional in his jailhouse calls to Senske and Julie, despite the fact he had not yet received antipsychotic medication. Specifically, Dr. Carroll noted Senske laughed when Suazo said he had checked for Dr. Glassman's identification card. Dr. Carroll continued, "Well, that shows some normal social interaction—[Senske and Suazo] kind of actually had a little joke about that, that [Suazo's] not really paranoid. He's afraid, and legitimately. He's never been in this situation before, doesn't want some doctor to come in. He wants to make sure that was the defense doctor that he knew was coming before he was going to say anything. So he has to see his I.D. [Suazo] explains that. Dr. Glassman sort of interpreted that in his report, that he thought [Suazo] was acting paranoid. But when you take it into context—and we have a phone conversation noting that—it really wasn't so paranoid. It was normal behavior."

Psychiatrist Park Dietz testified he had tried to interview Suazo, who refused to meet him based on the advice of his counsel. Dr. Dietz diagnosed Suazo as follows: "My judgment based on everything I do know about this case is that it isn't just drugs and alcohol. I think he has an illness . . . probably schizophrenia. That he probably had the delusions and hallucinations, which are called positive symptoms of schizophrenia, earlier than he would have otherwise because he is such a drug abuser and drinks so much so I think he hastened the onset of his illness by about two years from that drug

20

abuse."[5]  Dr. Dietz added, "I think if [Suazo had] been clean and sober he wouldn't have done this homicide."  Dr. Dietz testified that Suazo's firing from his job might explain the reason Suazo committed the murder:  "So one of the people [Suazo] was angry with for losing his job happens to be the man he would soon kill.  And one has to wonder is this a reason he would kill him?"

Dr. Dietz was skeptical whether Suazo was telling the truth to Dr. Glassman, noting that in Suazo's phone call to Senske, "[Suazo] said he didn't know whether [Dr. Glassman] believed him or thought he was making things up.  [Suazo] said that [Dr. Glassman] pushed him to see if he was faking.  And [Suazo] had been tempted to ask [Dr. Glassman] what he thought.  [¶]  The significance to me of that is that [Suazo is] concerned for the impression he's making on the evaluator, and how that will affect his case."  Dr. Dietz compared Suazo to two different groups of mentally ill patients:  "Sometimes mentally ill defendants are completely oblivious [of] the legal defense.  They may be uncooperative with their attorney.  They may insist that they're not mentally ill and that there is nothing wrong with them and they try to conceal it."  According to Dr.

_____

5    Dr. Dietz elaborated on this diagnosis:  "I think there may be some dispute as to the role that [Suazo's] drug abuse played in causing his mental disease or hastening it or worsening it.  [¶] . . . [¶] . . . [Suazo] has said he began drinking alcohol at [age] 15. There is considerable evidence indicating that he drank heavily for years.  He said he began using drugs at 13 or 16, and he's given quite inconsistent accounts of this. Different doctors get different stories from him so it's hard to know what is true about it. [¶]  He's smoked marijuana daily for years prior to his arrest.  [¶]  And he's abused at one time or another cocaine, methamphetamines, hallucinogenic mushrooms, oxycodone and PCP. That's a serious history of drug abuse.  [¶]  Then he admitted to detectives that he snorted cocaine shortly before the homicide and that has been corroborated by toxicology."

21

Dietz, other mental patients, who are complete malingerers, often proclaim their craziness, insisting they do not know right from wrong. Dr. Dietz concluded: "[Suazo is] neither of those extremes but he's evidencing concern about the impression he's making on Dr. Glassman and that makes me a bit skeptical."

Dr. Dietz testified regarding Suazo's jailhouse telephone comment during a discussion regarding possible harm to him in prison, and Suazo's comment, "Hopefully I'll end up going to some state hospital, though." Dr. Dietz said the comment "shows [Suazo is] very aware of the effect that his presentation of symptoms might have on his future lodging. And that does not necessarily mean that he's trying to mislead people to have a better life but it makes it possible that he would do that." In another telephone call, Suazo told his mother, "The symptoms have gone away." And Suazo asked her, "What is supposed to help me now?" Suazo also complained he looked "regular." Dr. Dietz concluded Suazo was concerned that if he looked "normal" and did not have any symptoms the jury might not find him insane.

Dr. Dietz concluded Suazo understood the nature and quality of his actions because Suazo told detectives he did not hear voices telling him to kill Raines. Dr. Dietz also testified: "Of great importance is that [Suazo's] actions show that he used a serrated knife to inflict lethal stab and incise wounds on [Raines's] neck. The fact that the wounds are inflicted on a vital region is significant in that if someone were not at all in touch with reality, were acting in a wild fashion, there would be no particular reason that the wounds would cluster in any lethal area of the body. They would be randomly located." Dr. Dietz added, "One always needs to wonder how does a victim end up under the control of

22

the offender and particularly so when [Raines] was somewhat heavier and taller than [Suazo]. And so in a fair fight equally armed, [Suazo] wouldn't necessarily have an edge. But if he attacks [Raines] from behind and by surprise, of course he has an edge. And that also suggests an intent to harm and knowledge of how [Raines] is likely to react."

Dr. Dietz noted the altercation had lasted approximately 10 to 15 minutes and Raines screamed for help; yet, Suazo persisted in killing Raines. This showed Suazo's actions were intentional and purposeful. Dr. Dietz concluded, "It's my opinion with reasonable medical certainty that at the time of the homicide, [Suazo] knew and understood the nature and quality of his acts, namely that he was taking the life of another human being."

On the question of whether Suazo knew his conduct was wrong, Dr. Dietz observed, "Here, the evidence is not as clear. First of all, I found no indication that [Suazo] believed what he was doing was right when he killed [Raines] and several pieces of evidence that are consistent with his knowing that what he did was wrong." Dr. Dietz elaborated that the altercation had lasted approximately ten minutes, raising a possibility that Suazo had planned the attack and ambushed Raines.

Regarding the question of whether Suazo was insane when he committed the murder, Dr. Dietz stated it was a jury question, and posed two questions for the jury's consideration: "First, did [Suazo] truly hear any voice tell him to kill the victim?" And second, "Assuming [Suazo] did hear a voice whom he identifies as Q telling him to kill [Raines], then the question is does [Suazo's] saying that Q was a god or like God . . . . Does [Q] have the same moral authority as God Almighty?"

23

DISCUSSION

I.

A.

Relying on *Wainwright v. Witt* (1985) 469 U.S. 412 and *Adams v. Texas* (1980) 448 U.S. 38, Suazo contends "jurors in cases involving insanity pleas should be qualified for service analogous to the way jurors are qualified for service on capital cases." (Capitalization and emphasis omitted.) Suazo concedes that *Wainwright* has not been extended beyond the death penalty context, but urges us to do so in this case.

We reject the contention on grounds Suazo failed to preserve it. "A party must make a timely and specific objection to the manner in which a trial court conducts jury selection or the matter is forfeited for appeal." (*People v. Mills* (2010) 48 Cal.4th 158, 170.) "[A]n objection is necessary to enable the court to avoid or correct error." (*People v. Holt* (1997) 15 Cal.4th 619, 656.) Suazo contends he preserved the issue for appeal by objecting at the new trial motion hearing. But that was not a timely objection because it did not enable the trial court to avoid or correct any perceived error in the jury selection process. Accordingly, the matter is forfeited.

In any event, Suazo has not shown that his jury was biased against him. "We have observed that the adequacy of voir dire is a matter ' " 'not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and responses to questions.' " ' [Citations.] The applicable standard is a demanding one: 'Unless the voir dire by a court

24

is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal. [Citation.] . . .' [Citations.] [¶] . . . 'The right to voir dire, like the right to peremptorily challenge [citation], is not a constitutional right but a means to achieve the end of an impartial jury.' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1250-1251.)

Finally, we note that Code of Civil Procedure section 197 et seq. outlines a comprehensive scheme for selecting jurors in criminal cases. Suazo has adduced no evidence that this scheme was inadequate for purposes of selecting an impartial jury in his case. Therefore, we have no basis for abandoning the Legislature's scheme and embarking on a judicially created experiment mandating qualified juries in cases where the defendant pleads insanity.

B.

Suazo contends the trial court erred by denying his challenges of prospective jurors for cause.

"Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence." (*People v. Weaver* (2001) 26 Cal.4th 876, 910.)

25

"If a defendant contends that the trial court wrongly denied a challenge for cause, he or she must demonstrate that the right to a fair and impartial jury thereby was affected. [Citations.] Initially, a defendant must establish that he or she exercised a peremptory challenge to remove the juror in question, exhausted the defendant's peremptory challenges, and communicated to the trial court the defendant's dissatisfaction with the jury selected. [Citations.] '[I]f he can actually show that his right to an impartial jury was affected because he was deprived of a peremptory challenge which he would have used to excuse a juror who sat on his case, he is entitled to reversal; he does not have to show that the outcome of the case itself would have been different.' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 121.)

Here, defense counsel moved to excuse Prospective Jurors Nos. 1, 12, 18 and 32 for cause. The court granted the challenge only as to Prospective Juror No. 32, and counsel exercised peremptory challenges to remove Prospective Jurors Nos. 1, 12, and 18. Counsel did not exhaust all of his 10 peremptory challenges; he had one challenge remaining. Defendant concedes he did not express his dissatisfaction with the jury selected until during the new trial motion, but claims that sufficed. We disagree. "[T]he issue was not preserved for appeal, as it is possible that counsel, despite initial misgivings, was ultimately satisfied with the overall composition of the jury. Also possible is that, had counsel expressed dissatisfaction, the trial court would have allowed him to exercise additional peremptory challenges." (*People v. Weaver*, *supra*, 26 Cal.4th at p. 911.)

26

To the extent Suazo contends he received ineffective assistance of counsel under *Strickland v. Washington* (1984) 466 U.S. 668, the claim fails because he cannot establish prejudice in light of the fact he exercised his peremptory challenges to remove three of the allegedly biased jurors, and he did not exercise all of his peremptory challenges. (Accord, *People v. Beames* (2007) 40 Cal.4th 907, 924 925; *People v. Avila* (2006) 38 Cal.4th 491, 540.) "Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." (*Davis v. Woodford* (9th Cir. 2004) 384 F.3d 628, 643.) Suazo concedes he is unable to identify any particular biased juror who was empanelled in this case. (See *People v. Blair* (2005) 36 Cal.4th 686, 742-743 ["defendant fails to identify any juror whom he would have excused had he not used his peremptory challenges to remove [2 jurors]. [Citations.] Accordingly, focusing on the 12 jurors who actually decided defendant's case, as we must, [citation], we conclude that defendant has not established that his right to an impartial jury was violated."] )

C.

Suazo contends the trial court impermissibly restricted his voir dire by its comment made to defense counsel outside of the prospective jurors' hearing. We disagree.

*Background*

During voir dire, a prospective juror asked about the bifurcation of proceedings between a guilt phase and a hearing regarding the insanity defense. The court explained

27

the differences between the guilt and sanity phases. Other prospective jurors asked how they would know if the defendant was faking the symptoms of insanity to avoid going to prison, and who had the burden of proof in the insanity phase. The court responded to both questions. Defense counsel next asked some prospective jurors whether they considered the insanity defense a loophole in the law, and they replied that they would require proof before making a finding of the defendant's insanity.

Immediately afterwards, the court told counsel the statement that Suazo challenges on appeal: "In light of the questions by [defense counsel], what I propose at this time is to tell the jury that as to insanity, were we to get to phase two of this trial, the burden of proof is on the defendant to prove he was insane at the time of the . . . crime, and the burden of proof is by a preponderance of the evidence, and that I will be giving them specific instructions on what constitutes legal insanity. [¶] *And then let's try and drop that because we're going to be here for a week, and nobody's going to give you the answer you want*." (Italics added.)

The court proceeded to instruct the prospective jurors on California law regarding bifurcated proceedings involving insanity pleas: "In light of [defense counsel's] questions concerning, if we get to phase two of the trial, what's this insanity stuff, I want to tell you briefly and then move on, that were we to get to the second phase of the trial, the question is whether or not Mr. Suazo was legally insane at the time of the commission of the homicide. That's the issue. [¶] The burden of proof on that phase of the trial is that of the defendant. So it's a different party that has the burden of proof. And the definition of the burden is not beyond a reasonable doubt, but, rather, a lower burden of proof called

28

by a preponderance of the evidence. In short, that means was it more likely than not that Mr. Suazo was legally insane at the time of the crime. [¶] Finally, as to the definition of legal insanity, California law has a rather specific definition of what constitutes legal insanity, and that law I will give you if and when the time comes. So I hope this puts it in a better framework. Because I didn't get into this with you earlier as to how this type of trial would proceed assuming you find him guilty, assuming we have a second trial, second phase of insanity. So it's a whole different process. I will painstakingly take you through it as to how we approach it and how you approach it. But at this point in time, I think you now have enough information as to the process, the legal process that we go through when a plea of not guilty by reason of insanity is also made."

Following the court's instruction, defense counsel asked prospective jurors whether they would hold the defendant to a higher burden of proof than the preponderance of the evidence standard applicable in the insanity phase, and they replied they would follow the applicable law. Defense counsel also asked whether anyone thought the defense should be required to prove insanity under the beyond a reasonable doubt standard, and some agreed, but insisted that they would abide by the court's instructions regarding the law.

*Analysis*

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) "In exercising its discretion under section 1044, a trial court must

29

be impartial and must assure that a defendant is afforded a fair trial. [Citation.] When there is no patent abuse of discretion, a trial court's determinations under section 1044 must be upheld on appeal." (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1334.)

Suazo did not preserve the issue for appeal because he did not object to the court's suggestion that he restrict his questions regarding the prospective jurors' attitude toward the insanity phase. "The controlling principle is that a defendant may not challenge on appeal alleged shortcomings in the trial court's voir dire of the prospective jurors when the defendant, having had the opportunity to alert the trial court to the supposed problem, failed to do so." (*People v. Fuviava* (2012) 53 Cal.4th 622, 653.)

Moreover, the court's ruling came after it had permitted the defense an extended opportunity to question the prospective jurors regarding the insanity phase, and in light of the court's instruction on that matter. Suazo has presented no evidence that the court abused its discretion in controlling the proceedings by its ruling. Finally, following the court's ruling, defense counsel continued asking the prospective jurors questions regarding their view of the insanity standard. Thus, defense counsel plainly was not inhibited by the court's earlier suggestion.

We reject Suazo's reliance on *People v. Cash* (2002) 28 Cal.4th 703, which unlike the present case, involved the death penalty. The *Cash* court concluded it was error for the trial court to prohibit any question about the death penalty during jury selection. Here, the court permitted inquiry regarding the insanity defense and provided counsel an opportunity to explore the prospective jurors' views on that issue. Again, "[a]ny claim of

30

prejudice, however, is necessarily speculative." (*People v. Ochoa* (1998) 19 Cal.4th 353, 448.)

## II.

Suazo contends the trial court erroneously instructed the jury regarding the presumption of sanity during the guilt phase, violating his constitutional rights to due process and a fair trial under the Fifth and Sixth Amendments of the Federal Constitution.[6] He further contends the instructions violated California law. He argues the court compounded the error when it rejected his proposed instruction that sanity is a legal issue and not a medical one. Suazo relies on two federal cases, *Stark v. Hickman* (9th Cir. 2006) 455 F.3d 1070 and *Patterson v. Gomez* (9th Cir. 2000) 223 F.3d 959, involving murder trials and bifurcated proceedings to address insanity pleas, as well as the California Supreme Court's decision in *People v. Mills* (2012) 55 Cal.4th 675 (*Mills*), which was decided after the trial in this case.

---

[6] Here, the court instructed prospective jurors during voir dire: "When a defendant pleads not guilty by reason of insanity, during the guilt phase of the trial, the defendant shall be conclusively presumed to have been sane at the time of the offense that is alleged to have been committed, which means that for purposes of the guilt trial, Mr. Suazo is conclusively presumed to have been sane. [¶] If and only if we get to the sanity trial, then that issue of whether he was sane or not comes into play." The Court continued, "As I indicated to you, you'll get further instructions on the issues of sanity and insanity at the second phase of the trial, if we get there."

After the close of evidence during the guilt phase, the court similarly instructed the jury: "When we talked earlier about the two phases of a trial such as this, we talked about the guilt phase and we talked about the sanity phase. You will remember that I gave you an earlier instruction as follows: [¶] When a defendant pleads not guilty by reason of insanity, during the guilt phase of trial, the defendant shall be conclusively presumed to have been sane . . . at the time the offense is alleged to have been committed."

31

*Mills*, *supra*, 55 Cal.4th 675 governs this case. The court there instructed the jury in part that " '[f]or the purpose of reaching a verdict in the guilt phase of this trial, you are to conclusively presume that the defendant was legally sane at the time the offenses [are] alleged to have occurred.' " (*Id*. at p. 678, fn. 10.) The California Supreme Court concluded, based on the facts and manner in which the case was tried that there was no due process violation. It stated, "Whether or not the instructions as a whole were sufficient to overcome the effect of the presumption of sanity instruction, however, the manner in which this case was tried leaves us confident there is no reasonable likelihood that the jury gave effect to the conclusive presumption. Defense counsel strongly urged the jury to consider the mental health evidence in determining whether defendant had acted in unreasonable self-defense. Indeed, this was the centerpiece of the defense." (*Id*. at p. 679.)

The instruction given here is substantively identical to the one the *Mills* court found "had no bearing on any issue before the jury at the guilt phase of defendant's trial." (*Mills*, *supra*, 55 Cal.4th at p. 676.) However, here, in light of the way this case was tried, we are likewise confident there is no reasonable likelihood the jury gave effect to the conclusive presumption. During closing argument, defense counsel repeatedly emphasized that the crux of the case was Suazo's reduced mental state. Specifically, defense counsel argued: "[D]uring jury selection, you said you want the facts. Well, we gave you the facts. We gave you all the evidence. We gave you facts. And you heard about [Suazo's] thought disorders. You heard about his bizarre behavior. This is not

32

because of drugs. This is not because of alcohol. Ian Suazo is mentally ill. And if the government felt that this was all because of drugs and alcohol, why didn't they bring in a psychiatrist or psychologist to tell you otherwise? Couldn't find one." Defense counsel further argued: "[Suazo] was completely irrational that night. Sawing off your arm to the point where—even Officer Hartman, [the pathologist], and even Brian Kennedy told you he almost severed his arm off. Is that rational? Is that rational? Pouring salt around your windows to keep out the evil spirits. Is that rational behavior? Is Googling protection against soul collection rational? Is that rational behavior?" Defense counsel also criticized the prosecution's theory of the case: "[The prosecution] can't have it both ways. They can't stand here in their closing argument and during their cross-examination of all the witnesses and take you down this path of drugs, alcohol, drugs, alcohol, this is drugs, alcohol, and then stand here and tell you, 'well, he was rational and able to premeditate and deliberate.' Can't have it both ways."[7]

---

[7]     In summarizing the evidence, defense counsel further called attention to Suazo's mental illness, arguing: "What did Paul tell you about that night? That he was so concerned about [Suazo] . . . because he was pacing back and forth inside the house, back and forth, in and out of the house. He was just pacing. . . . [Suazo] had his hands on his chest. He looked up like a demon. Looked like a demon. Delusional. He's mentally ill. He was hearing voices. He was drinking. He was doing drugs. And [Suazo] told you, 'I just remember carving my wrist.' "
Defense counsel also argued: "You heard Julie's testimony. From 2006 to 2008 when [Suazo was] free of drugs and alcohol, he was suspicious of birds. He was suspicious of bugs. He thought he could hear voices from the vents. He was always talking about these crows and these black birds . . . paranoia, mental illness, completely irrational. And Julie told you and Nathan told you that in that time frame he was still hearing voices. He was completely paranoid still."

In fact, so strong was defense counsel's focus on Suazo's mental condition during closing arguments that at the start of rebuttal arguments, the prosecutor stated, "At one point in time I thought I had fallen asleep and woken during the sanity phase of the case because that's what it sounded like we were talking about there. But as I indicated before and as his honor indicated to you, this particular phase that we're in, it's the guilt phase."

Although here the prosecution did refer to the presumption of sanity more times than the one time the prosecutor in the *Mills* case did, the thrust of the prosecutor's closing argument here was the same as in *Mills:* "She placed great weight on the testimony of the eyewitnesses and the physical evidence, contending that defendant's version of the events was inconsistent with what others saw." (*Mills*, *supra*, 55 Cal.4th at p. 679.) Accordingly, we also conclude that "In light of the prosecutor's arguments challenging the merits of the defense theory, it is highly unlikely that the jury would base its decision on the presumption of sanity instead of the evidence and the proper instructions." (*Ibid.*)

B.

The *Mills* court held that as a matter of state law, the instruction is no longer to be given in the guilt phase: "The presumption of sanity is not pertinent to any issue at a trial on the question of guilt. The matter of the defendant's sanity is not before the jury, and evidence of insanity is inadmissible. [Citations.] In a bifurcated trial under section 1026, it is proper to inform the jury of the procedure specified by statute, but there is no reason to tell it, before or during the guilt phase, that the defendant is conclusively presumed sane for purposes of trial. [¶] The Legislature's intent in providing for bifurcation when

34

a defendant pleads both not guilty and not guilty by reason of insanity was to *simplify* the issues before the jury, by 'remov[ing] entirely from the first stage of the trial any issue as to legal sanity.' [Citation.] The defendant is presumed sane for *procedural* purposes, not for any evidentiary purpose. [Citations.] An instruction on the presumption of sanity only complicates matters at the guilt phase by injecting the subject of sanity before it is at issue." (*Mills*, *supra*, 55 Cal.4th at p. 681.) Nevertheless, the court noted that this instructional error regarding an inapplicable legal theory is reviewed under the reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Mills*, at p. 681.)

Applying the *Watson* standard, we conclude it is not reasonably probable Suazo would have had a more favorable outcome. The evidence of Suazo's guilt was strong and direct. He does not deny he killed Raines. The trial court properly instructed regarding the mental state required for a finding of homicide and first and second degree murder. "We have explained in connection with defendant's due process argument that the jury was not reasonably likely to have applied the presumption of sanity to foreclose consideration of his mental state evidence. That analysis applies equally to the question of prejudice under *Watson*[, *supra*, 46 Cal.2d 818]." (*Mills*, *supra*, 55 Cal.4th at p. 766.) We are satisfied that it is not reasonably probable that absent the instruction on the presumption of sanity that the jury would have reached a different verdict.[8]

---

[8] The trial court rejected Suazo's new trial motion brought on the ground that the court had improperly instructed regarding the presumption of sanity in the guilt phase, stating: "I thought [the defense] hit a home run on the guilt phase. That could have just

## III.

Suazo contends the court erroneously instructed the jury with CALCRIM No. 372 regarding flight because insufficient evidence supported it. He specifically argues: "[B]y exiting the apartment and venturing out onto the public street dripping a visible 'blood trail,' [he] patently increased, rather than lessened, the odds of his discovery and capture. [¶] Likewise, his subsequent decision to throw himself in front of a moving vehicle, preceded by reports he was running in and out of traffic, could hardly be viewed as efforts to avoid apprehension as they also increased the odds of his discovery and capture." He maintains the flight instruction lessened the prosecution's burden of proof, thus violating his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

During the guilt phase of the trial, the court instructed the jury with CALCRIM No. 372: "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

as easily been first degree murder. But the manner in which the defense presented its case, essentially the jury found that the killing was not premeditated. And it appears to the court, who heard the case along with this jury, that the jury accepted the defense position that . . . without calling expert witnesses but referring colloquially to witnesses who describe Mr. Suazo as nuts, crazy. [¶] And with the evidence of . . . intoxication through alcohol and/or drugs, [the jury] . . . unanimously found that the prosecution did not prove [first degree murder in the guilt phase]."

36

Whenever the prosecution relies in part on evidence of the defendant's flight, the trial court has a sua sponte duty to instruct the jury with CALCRIM No. 372 or its equivalent. (§ 1127c.) "Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest a purpose to avoid being observed or arrested." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328, internal quotations omitted.)

Here, when Paul returned to the apartment, water was running in the bathtub and Suazo had left. Detectives found a blood trail leading to the beach. Suazo told detectives that after the murder, he ran to the beach. When police detained Suazo several hours later, he gave them a false surname. The foregoing evidence sufficed to instruct the jury regarding flight. We note that Suazo's trail of blood and his subsequent suicide attempt in traffic are not inconsistent with flight. "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 328.)

Suazo concedes that his giving the police a false surname "*could* have been consistent with 'consciousness of guilt.' " He adds, "However. . . it was equally consistent with confusion on Suazo's part given his psychosis and all that had occurred." The argument is unavailing. "The evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence." (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)

California courts have rejected the contention that the flight instruction creates an unreasonable inference and lowers the prosecution's burden of proof. (*People v.*

37

*Navarette* (2003) 30 Cal.4th 458, 502 [CALJIC No. 2.52]; *People v.Mendoza* (2000) 24 Cal.4th 130, 179-180 [" ' "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." ' "]; *People v. Paysinger* (2009) 174 Cal.App.4th 26, 31-32 [CALCRIM No. 372]; *People v. Hernandez Rios* (2008) 151 Cal.App.4th 1154, 1157-1159 [CALCRIM NO. 372].) Permitting "a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a consciousness of guilt" does not violate due process. (*Mendoza*, at p. 180.)

IV.

Suazo contends the jury's finding he was sane must be reversed because the evidence of his insanity was so substantial that a jury could not reasonably reject it.

*Standard of Review*

Insanity, under California law, means that at the time the offense was committed, the defendant "was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong." (§ 25, subd. (b); *People v.Skinner* (1985) 39 Cal.3d 765, 776-777.) However, insanity may not be based solely on an addiction to, or the abuse of, intoxicating substances. (§ 29.8 ["In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of . . . an addiction to, or abuse of, intoxicating substances."].)

"The 'sanity trial is but a part of the same criminal proceeding as the guilt phase' [citation] but differs procedurally from the guilt phase of trial 'in that the issue is confined

to sanity and the burden is upon the defendant to prove by a preponderance of the evidence that he was insane at the time of the offense.' " (*People v. Hernandez* (2000) 22 Cal.4th 512, 521.)

We apply the substantial evidence test in our review of the jury's sanity verdict. "A state court conviction that is not supported by sufficient evidence violates the due process clause of the Fourteenth Amendment and is invalid for that reason." (*People v. Rowland* (1992) 4 Cal.4th 238, 269, citing *Jackson v. Virginia* (1979) 443 U.S. 307, 313-324.) In determining the sufficiency of the evidence, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia*, at p. 319.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Chavez* (2008) 160 Cal.App.4th 882, 891 ["[T]he substantial evidence test applies to appellate review of a sanity determination."].) However, "[b]ecause the burden was on the defense to show by a preponderance of the evidence that appellant was insane, before we can overturn the trier of fact's finding to the contrary, we must find as a matter of law that the [trier of fact] could not reasonably reject the evidence of insanity." (*People v. Skinner* (1986) 185 Cal.App.3d 1050, 1059.) In addition, "jurors are not automatically required to render a verdict which conforms to [even] unanimous expert opinion as to a defendant's sanity.

39

Our Supreme Court has frequently upheld on appeal verdicts finding a defendant sane in the face of contrary unanimous opinion." (*People v. Duckett* (1984) 162 Cal.App.3d 1115, 1119.)

*Analysis*

Here, Dr. Dietz opined Suazo understood the nature and quality of his actions because he told the detectives that the voices he heard did not tell him to hurt Raines or Paul. Further, based on the wounds he inflicted on Raines's vital regions, Suazo appeared intent on harming him. Dr. Carroll testified based on Raines's wounds and in light of Blair Robb's testimony that he heard Raines plead that Suazo was killing him, that Suazo was aware of the nature and quality of his acts. This expert evidence itself constitutes substantial evidence to support the jury's finding of sanity, despite the existence of contrary expert opinion and evidence. Accordingly, we adopt the complete analysis of an earlier case on similar facts: "As to the question whether defendant was sane at the time the crime was committed, the opinion of the psychiatrist[s] called by defendant was opposite to that of the qualified expert called by the prosecution. . . . [T]he jury's finding, supported both by the presumption and other substantial evidence, is immune from successful attack." (*People v. Dean* (1958) 158 Cal.App.2d 572, 577-578; accord, *People v. Chavez* (2008) 160 Cal.App.4th 882.)

Suazo's reliance on *People v. Duckett*, *supra*, 162 Cal.App.3d at page 1123 is unavailing. There, the court concluded the jury was presented with no circumstances permitting it to reject the expert's opinion that the defendant was legally insane. By contrast, here, as noted, Dr. Dietz's and Dr. Carroll's testimony provided sufficient basis

40

contradicting that of other experts' findings that Suazo was insane when he murdered

Raines. (*People v. Chavez, supra*, 160 Cal.App.4th at p. 891.)[9]

## V.

Suazo contends the court did not adequately nor accurately instruct the jury with

CALCRIM No. 3450 regarding the effect of intoxication on the defense of insanity.

Specifically, he contends the court preinstructed the jury with one version of the

---

[9] We note the trial court rejected Suazo's similar argument at the new trial motion and stated the evidence sufficed to support the jury's finding of sanity: "The second basis [for the new trial motion] is that the jury's verdict of sanity was contrary to the law and to the evidence. Likewise, seated as a 13th juror, that basis fails. [¶] No one testified, as this Court recalls, that Mr. Suazo did not have a mental illness. Were it to stop there and were the only requirement to be that Mr. Suazo at the time of the killing had a significant severe mental illness, if that were the definition of insanity, I'd grant a new trial. [¶] But to follow through the law of insanity in California, the defense must prove that because of the mental illness, Mr. Suazo did not know . . . both the nature and quality of his act and the difference between right and wrong . . . it fails on both accounts. [¶] This was a . . . lying in wait killing where Mr. Suazo used and selected . . . not a rubber duck to slice the roommate's neck but a serrated knife, and he waited with that knife. And when the roommate said, 'Stop. You're killing me,' [Suazo] didn't stop. He kept doing it. [¶] And then afterwards the acts of Mr. Suazo, albeit strange and seemingly unbelievable, were nonetheless consistent with a consciousness of guilt. He tried to drown himself. He tried to cut off his hand. And failing both of those attempts, he jumps in front of a car, and that doesn't . . . work either. [¶] There's no question but that Mr. Suazo knew that what he was cutting was a person, not . . . an inanimate object or animal. That the instrumentality was appropriate to the task. That the lying in wait was appropriate to catching the roommate by surprise. And then we know from the evidence that his . . . recent employment termination is believed by Mr. Suazo to be [Raines's] fault. [¶] So, you know, all of that is consistent with knowing the nature and quality of the act that caused the death of the roommate. And it's also consistent with the finding that Mr. Suazo—the implied finding that Mr. Suazo knew this was morally wrong. His conduct right after the incident was a clear indication of a consciousness of guilt. . . . [¶] And this is a horribly bothersome case that was sad and everybody lost. But whether or not the jury erred in concluding that Mr. Suazo was legally sane at the time of the homicide, this court finds that there was plenty of evidence to support that finding both on the nature and quality and the right and wrong tests."

instruction, but later instructed with a modified version of the same instruction. Further, the court did not formulate an instruction for the precise facts presented here. Suazo contends the errors were prejudicial because the jury was already hostile to the insanity defense and likely was poisoned by the court's preinstruction with CALCRIM No. 3450, despite the court later changing its instruction; the prosecutor's examination of expert witnesses aligned with the disputed portions of CALCRIM No. 3450; and, the prosecutor's arguments to the jury emphasized the experts' testimony that "but for" Suazo's use of drugs, the murder would not have happened.

*Background*

At the beginning of the sanity phase, the court preinstructed the jury with CALCRIM No. 3450, including two optional bracketed paragraphs relating to the use of alcohol and drugs.[10] At the end of the sanity phase, the court changed course and,

_____

10    We set forth the court's preinstruction to the jury with the disputed sections of CALCRIM No. 3450 in brackets: "You must now determine whether Mr. Sauzo was legally sane or legally insane at the time of the commission of the crime. This is the only issue for you to determine in this proceeding. You should consider all of the evidence received in the guilt phase of this trial along with all of the instructions you have been given which are not inconsistent with the instructions that I will be giving to you. [¶] You must decide whether Mr. Suazo was legally insane when he committed the crime. [¶] The defendant must prove that it is more likely than not that he was legally insane when he committed the crime. [¶] The defendant was legally insane if: [¶] 1. When he committed the crime, he had a mental disease or defect; and [¶] 2. Because of that disease or defect, he did not know or understand the nature and quality of his act or did not know or understand that his act was morally or legally wrong. [¶] None of the following qualify as a mental disease or defect for purposes of an insanity defense: personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts.

"[Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal insanity. This is

42

following extensive discussions with counsel, instructed the jury with a version of CALCRIM No. 3450 that excluded the bracketed sections. The court explained its dilemma revolved around its wanting to give the first bracketed paragraph but not the second one, for which there was no evidentiary basis; however, the court did not want to confuse the jury. Defense counsel asked the court, "[Do] you think we should try to create a special instruction of [CALCRIM No.] 3450?" The court replied, "I think you

true even if the intoxicants cause organic brain damage or a . . . settled mental disease or defect that lasts after the immediate effect of the intoxicants have worn off. [¶] Likewise, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity.]

"[If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity. A settled mental disease or defect is one that remains after the effect of the drugs or intoxicants has worn off.]

"You may consider any evidence that the defendant had a mental disease or defect before the commission of the crime. If you're satisfied that he had a mental disease or defect [before] he committed the crime, you may conclude that he suffered from the same condition when he committed the crime. You must still decide whether that mental disease or defect constitutes legal insanity. [¶] If you find the defendant was legally insane at the time of his crime, he will not be released from custody until a court finds he qualifies for release under California law. Until that time he will remain in a mental hospital or outpatient treatment program, if appropriate. He may not, generally, be kept in a mental hospital or outpatient program longer than the maximum sentence available for his crime. If the state requests additional confinement beyond the maximum sentence, the defendant will be entitled to a new sanity trial before a new jury. Your job is only to decide whether the defendant was legally sane or insane at the time of the crime. You must not speculate as to whether he's currently sane or may be found sane in the future. You may not let any consideration about where the defendant may be confined, or for how long, affect your decision in any way. [¶] You may find that at times the defendant was legally sane and at other times was legally insane. You must determine whether he was legally insane when he committed the crime. If you conclude that the defendant was legally sane at the time he committed the crime, then it is no defense that he committed the crime as a result of an uncontrollable or irresistible impulse. [¶] If, after considering all the evidence, all 12 of you conclude the defendant has proved to you that it is more likely than not that he was legally insane when he committed the crime, you must return a verdict of not guilty by reason of insanity."

43

ought to read that [first bracketed] paragraph and see if that lets us do what you want to do, [defense counsel], without going to the . . . next paragraph, which requires, as I read it, that the mental disease has to be caused by the long-term use of drugs and intoxicants, which we don't have through expert witnesses verifiable in this case."

In discussions the next day, the prosecutor argued in favor of instructing with the two bracketed paragraphs: "[T]his is kind of a hybrid situation we find ourselves in, insofar as this factually speaking because usually it's . . . either drugs only or it's mental illness. We have a guy that has a mental illness. We're all agreed on that. Our doctors agree as well, but what we tried to establish as far as the case was concerned, just because you have a mental illness doesn't allow you, especially if you have a subjective awareness of how dangerous using drugs are to your situation, to allow you, if you otherwise conduct your life in what . . . can be otherwise considered a normal manner."

The court stated it would not give the second bracketed paragraph, but questioned, "Does giving the [first bracketed paragraph] without giving the [second bracketed paragraph], could that confuse the jury such that if they find that Mr. Suazo is not insane, that an appellate court would on review of the evidence, the opinions and that instruction, conclude that the jury was improperly instructed and confused by the giving of that paragraph? I don't have the answer, obviously."

Defense counsel replied: "I think that the [first bracketed paragraph] is talking about addiction or abuse of drugs only, and doesn't talk at all about the use of drugs in addition to a settled mental disorder independent of the drugs resulting in a temporary condition. What's happening is the jury is going to be encouraged, as they have been

44

throughout the whole trial, to hold Mr. Suazo responsible for possibly exacerbating an already severe psychotic condition which has already resulted in at least one attempt on his own life, and other overt psychotic behaviors on that night also resulted in another two attempts on his own life, and so what the prosecution is saying is that if a person who is already involved in a psychotic episode exacerbated his already existing psychotic episode by doing drugs, that he loses the insanity defense. And that's not what's the law."

The court concluded, "I'm giving [CALCRIM No.] 3450 except for the two bracketed paragraphs . . . and I don't think that precludes either [party] from talking about your theory of the case. So unless you want both [bracketed paragraphs, defense counsel], I'm going to give neither." Defense counsel replied, "I don't want either." Defense counsel asked the court to clarify whether the prosecution would "be allowed to argue to the jury that because Dr. Carroll and Dr. Dietz said that the homicide would not have occurred but for the ingestion of the cocaine, that therefore Mr. Suazo is ineligible for the insanity defense?" The court replied in the negative, and later explained: "I just wish there had been a case before our case that dealt with the use of drugs and alcohol and a schizophrenic diagnosis. There isn't. I've done the best I can to listen to you all and be fair to you all, but I just don't believe the state of the law in California on insanity defenses is that 'but for' the use of alcohol and drugs on the part of Mr. Suazo, who is schizophrenic, that precluded the defense of insanity."

*Analysis*

The People contend any error was invited. We agree. The doctrine of invited error applies "to estop a party from asserting an error when 'his own conduct induces the

45

commission of error.' " (*People v. Perez* (1979) 23 Cal.3d 545, 549-550, fn. 3, italics omitted.) " 'When a defense attorney makes a "conscious, deliberate tactical choice" to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 675.)

Here, defense counsel made a deliberate, tactical decision, telling the court it did not want instruction with either of the bracketed paragraphs in CALCRIM No. 3450 because including those paragraphs would encourage the jury to hold Suazo responsible for exacerbating his severe psychosis. Suazo is therefore precluded from challenging the correctness of the instruction on appeal. (Accord, *People v. Hardy* (1992) 2 Cal.4th 86, 152.)

Moreover, defense counsel specifically proposed to the court that he could formulate a pinpoint instruction, but he never did so. A defendant's failure to request a clarifying or amplifying instruction at trial waives a claim on appeal that the instruction given was ambiguous or incomplete. (*Id*. at pp. 778-779; *People v. Cole* (2004) 33 Cal.4th 1158, 1211; *People v. Hart* (1999) 20 Cal.4th 546, 622; *People v. Sanchez* (2001) 94 Cal.App.4th 622, 635.)

In any event, on the merits, we still would find no reversible error. The first disputed bracketed paragraph in CALCRIM No. 3450 is an accurate statement of the law. It incorporates section 29.8, which states a not-guilty-by-reason of insanity determination "shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances." The

46

court erred by not instructing the jury with this paragraph, which was applicable here. However, the asserted error was not prejudicial. Rather, defense counsel was allowed to argue to the jury in the sanity phase that despite Suazo's drug use he was still entitled to a sanity defense, and defense counsel stated: "And there has been evidence that Mr. Suazo used drugs which made his mental condition worse. That doesn't deny him the insanity defense. It is sad and it is tragic, but it doesn't deny him the insanity defense."

Defense counsel also rebutted the prosecutor's defense relating to Suazo's drug use, arguing: "[W]hat you've heard from the prosecution in their argument in the guilt phase and their . . . opening statement in the insanity phase, was what was presented to you by [Dr.] Dietz. Drugs, drugs, drugs, drugs, drugs, drugs, drugs; choice, choice, choice; voluntary, voluntary, voluntary, voluntary. [¶] . . . Even assuming that the cocaine caused a worsening of Mr. Suazo's psychosis so that it resulted in the death of Ocie Raines, and if in the opinion of the doctor that the death would not have happened without the cocaine, does that take the insanity defense away from Mr. Suazo? And what you heard from Dr. Dietz yesterday afternoon, no, it doesn't. [¶] And so later on today when you hear about drugs and you hear about Mr. Suazo's voluntary ingestion of the drugs, and when you hear about how Mr. Suazo took a dose of cocaine that caused him to do something that he has never done before, that is to be violent, you need to ask yourself with respect to the insanity law and the insanity analysis that you have to engage in to follow the law, 'So what?' That ship sailed yesterday afternoon." Here, "if the instruction had any effect at all, it *benefitted* appellant by increasing the prosecution's burden of

47

proof." (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181.) Therefore, any error was harmless.

The court did not err by excluding the second bracketed paragraph because the evidence did not support giving it. There was no evidence that Suazo suffered from "a settled mental disease or defect caused by the long-term use of drugs or intoxicants." "Request for instruction on a legal point should be refused if there is no evidence to which the instruction may be properly related." (*People v. Robinson* (1999) 72 Cal.App.4th 421, 428.)

Misreading of jury instructions is at most harmless error when the written instructions received by the jury are correct. (*People v. Osband* (1996) 13 Cal.4th 622, 687.) The written version of jury instructions controls should there be any conflict between the written instructions and the oral instructions. (*People v. Osband*, *supra*, 13 Cal.4th at p. 717; *People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1113.) Here, any error caused by the court's preinstruction with the full version of CALCRIM No 3450 was cured by the jury's access to the redacted version during deliberations. Finally, as noted, in light of the experts' testimony regarding Suazo's sanity, it is not reasonably probable the jury would have returned a more favorable verdict absent any error in the court's instruction regarding Suazo's use of intoxicants.

VI.

Suazo contends the trial court improperly instructed the jury that it could consider his refusal to be interviewed by Dr. Dietz. Suazo claims the court should have granted his request to additionally inform the jury his refusal was on the advice of counsel.

48

Specifically, Suazo argues, "Inviting the jury to speculate, or to punish Suazo for following the advice of counsel, without informing jurors that he *was, in fact*, following the advice of counsel, violated [the] basic tenet" that discovery rules are designed to ensure a fair and reasonable search for the truth, based on reliable information.

*Background*

Before trial, the prosecutor filed a motion asking the court to compel Suazo to submit to an examination by Dr. Dietz under section 1054.3 because Suazo had placed his mental state at issue. Defense counsel opposed the motion, arguing the requested examination would violate Suazo's rights to due process and against self-incrimination.

At a pretrial hearing on the motion, the court tentatively granted the motion because by pleading not guilty by reason of insanity, Suazo had waived his Fifth and Sixth Amendment rights to the extent necessary for Dr. Dietz to complete the forensic examination. The court cautioned that if Suazo refused to submit to the examination, an instruction regarding the effect of such refusal would be given to the jury. The court asked Suazo, "Do you refuse to submit to the mental examination by the prosecution psychiatrist Dr. Dietz?" Suazo answered, "Based on the advice of my counsel, I do refuse to, your Honor." The court asked Suazo whether he was aware of the consequences as explained. Suazo responded, "Yes, I am, your Honor."

During the sanity phase, before the People's first witness, the court reminded the parties that it had ordered Suazo to be examined by Dr. Dietz, but Suazo had refused. The court stated that if the People requested it, it would instruct the jury regarding that

49

refusal. The prosecutor stated she was making that request. The court asked her to prepare a suggested instruction for review.

In the sanity phase, Dr. Dietz testified he tried interviewing Suazo in 2009, but defense counsel declined to permit him to evaluate Suazo. In 2010, Dr. Dietz again unsuccessfully tried to interview Suazo, who stated that "based on advice of counsel, he refused to be examined."

The prosecutor submitted a proposed jury instruction stating, "The court in this case ordered the defendant to submit to an evaluation by Dr. Park Dietz, a psychiatrist retained by the prosecution, as requested by the prosecution. If you find that the defendant refused to submit to such evaluation, it is up to you to decide the meaning and importance of the refusal." Defense counsel asked the court to insert the words, "on advice of counsel" after "to submit to such evaluation." The court declined the request and instructed the jury in the language the prosecutor proposed.

*Analysis*

Under section 1054.3, subdivision (b)(1), the Legislature broadly authorizes examination by a prosecution-retained expert whenever the defendant has put his or her mental condition at issue. (*Sharp v. Superior Court* (2012) 54 Cal.4th 168, 174-175.) Here, the court specifically informed Suazo that the consequence of his failure to permit the interview with the prosecution's psychiatrist was a jury instruction on that issue, but Suazo nonetheless refused to participate in an interview with Dr. Dietz.

We conclude Suazo suffered no prejudice from any claimed instructional error under the applicable *Watson* standard (*People v. Vasquez* (2006) 39 Cal.4th 47, 66). As

50

noted, the jury was aware from Dr. Dietz's testimony that Suazo refused the interview based on his attorney's advice. Additionally, the jury heard testimony from several psychiatrists, who argued both sides of the issue of Suazo's sanity. Sufficient evidence supported the jury's finding Suazo was sane when he murdered Raines.

## VII.

Suazo contends that even if we find no individual error in the guilt phase to have been prejudicial, the cumulative effect of the alleged errors requires reversal. (*People v. Holt* (1984) 37 Cal.3d 436, 458-459.) Having identified but two nonprejudicial instructional errors, we find no error that, either alone or in conjunction with others, prejudiced Suazo. (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

## DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.

51